STATE OF NEW MEXICO
COUNTY OF SANTA FE
FIRST JUDICIAL DISTRICT

Case No. D-101-CV-2014-00446

PING LU; JILL MCKEON, RICHARD MCKEON,
STEPHEN SPENCER, SPENCER STOPA; and
JUDY C. WINNEGAR,

      Plaintiffs,
v.

OPPENHEIMERFUNDS, INC.; OFI
PRIVATE INVESTMENTS, INC.; and
OPPENHEIMERFUNDS DISTRIBUTOR, Inc.,

      Defendants.

## FIRST AMENDED COMPLAINT

Plaintiffs Ping Lu, Jill McKeon, Richard McKeon, Stephen Spencer, Spencer Stopa and Judy C. Winnegar (collectively, "Plaintiffs"), by and through below-signed counsel, bring this Complaint against Defendants OppenheimerFunds, Inc. ("OFI"), OFI Private Investments, Inc. ("OFIPI"), and OppenheimerFunds Distributor, Inc. ("OFDI") (OFI, OFIPI and OFDI are collectively referred to hereinafter as "Defendants" or "Oppenheimer").

### PARTIES

1.   Plaintiff Ping Lu is a resident of Bernalillo County, New Mexico.

2.   Plaintiff Jill McKeon is a resident of Los Angeles County, California.

3.   Plaintiff Richard McKeon is a resident of Los Angeles County, California.

4.   Plaintiff Stephen Spencer is a resident of Sandoval County, New Mexico.

5.   Plaintiff Spencer Stopa is a resident of Otero County, New Mexico.

6.   Plaintiff Judy C. Winnegar is a resident of Santa Fe County, New Mexico.



7.  Plaintiffs bring this claim as assignees of claims The Education Trust Board of New Mexico ("Board"), The Education Plan Trust of New Mexico ("Trust"), and the State of New Mexico ("State") (collectively, "Assignors") have or may have against Defendants. Plaintiffs hold the assigned claims on behalf of themselves and a class certified in New Mexico State Court (the "Lu Class"), but this case against Defendants is not brought as a class action or collective action. It is a direct action between Plaintiffs/Assignees and Defendants.

8.  OFI is, on information and belief, a Colorado corporation. OFDI is, on information and belief, a New York corporation. OFIPI is, on information and belief, a wholly-owned subsidiary of OFI.

9.  On or around November 10, 2005, the State, through the Board, entered into a Program Management Agreement ("PMA") with OFI, pursuant to which OFI agreed to serve as Program Manager of New Mexico's two tax-favored educations savings plans, commonly known as 529 Plans: The Education Plan and the Scholar'sEdge Plan (collectively referred to hereinafter as the "Plans"). As Program Manager, OFI's duties included the duty to "invest and manage the assets of the Trust as investment agent of the Board . . . ." OFI later delegated its duties to a wholly owned subsidiary, OFIPI, but OFI also continued to remain responsible for the performance of such duties under the PMA. OFDI, another wholly-owned subsidiary of OFI, provided distribution services for the Plans.

10. Under the terms of the PMA, Defendants undertook several duties, including:

   a.  Recommending Plan investments for Board review and approval.

   b.  Reporting to the Board quarterly and annually.

   c.  Reserving the right to alter the management, operation, and all other matters relating to the ongoing business of the underlying funds offered

though the Plans without receiving the consent of the Board.

    d.    Agreeing to be liable to Assignors under certain circumstances:

> OFI and OFDI will be liable, jointly and severally, to the Board and its members, the Treasurer, the State and their officers and employees for any and all losses, damages, costs, claims, liabilities, penalties, demands and expenses (including, without limitation, reasonable attorneys' fees and disbursements) (collectively called "Losses") suffered, incurred, or sustained by the Board and its members, the Treasurer, the State and their officers and employees, or to which the Board and its members, the Treasurer, the State and their officers and employees becomes subject, to the extent resulting from, arising out of or relating to a material breach by OFI or OFDI of their duties, obligations, representations, warranties or covenants under this Agreement or any gross negligence, bad faith, willful misconduct, fraud of OFI or OFDI or their officers, employees, representatives, delegates, subcontractors or agents . . . .

    e.    Agreeing to indemnify Assignors for any Losses it caused:

> OFI and OFDI will indemnify, defend and hold harmless the Board and its members, the Treasurer, the State and their officers and employees (collectively, the "Plan Indemnitees") from and against for any and all Losses suffered, incurred, or sustained by the Plan Indemnitees or to which any of them becomes subject, to the extent resulting from, arising out of or relating to a breach of this Agreement or constituting gross negligence, bad faith, willful misconduct or fraud by OFI or OFDI or their officers, employees, agents, representatives, delegates or subcontractors of their duties under this Agreement . . . .

11.    The PMA is governed by New Mexico law. It also provides for exclusive venue within the State of New Mexico. Any disputes under the PMA are within the jurisdiction of State of New Mexico Judicial Districts, but "if a Claim must be brought in a federal forum," that forum shall be the United States District Court for the District of New Mexico.

## SETTLEMENT OF PLAINTIFFS' CLAIMS AGAINST DEFENDANTS

12. Plaintiffs sued Assignors for the losses suffered in their Plan accounts (the "Lawsuit"). The allegations of Plaintiffs' First Amended Class Action Complaint filed in the Lawsuit are incorporated herein by reference. Assignors denied liability to Plaintiffs.

13. Through the claims and demands made by Plaintiffs in the Lawsuit, the Assignors suffered, incurred, sustained and became subject to Losses from and against which Oppenheimer agreed to indemnify the Assignors as set forth in Sections 12.1 and 12.2 of the PMA and Section V of the June 16, 2010 Settlement Agreement between the State and Oppenheimer, including attorneys' fees and costs in the amount of approximately $1,219,439. The Assignors have released Oppenheimer from certain claims, but have reserved those claims for indemnification identified in Section 12.2 of the PMA and Section V of the June 16, 2010 Settlement Agreement between the State and Oppenheimer.

14. On October 7, 2013, the Assignors and Plaintiffs entered into a Stipulation of Settlement pursuant to which they agreed to resolve the claims made against the Assignors in the Lawsuit for consideration of a cash payment by the State to Plaintiffs in the amount of $3,750,000.00, and the assignment of certain indemnification rights against Oppenheimer.

15. Pursuant to the Stipulation of Settlement, the Assignors have transferred, assigned and set over to Plaintiffs all indemnification rights that the Assignors possess against OFI, OFIPI and/or OFDI with respect to any and all Losses as defined in paragraph 4 of the Assignment and existing as of October 7, 2013, including but not limited to rights of indemnification arising under Sections 12.1 and 12.2 of the PMA and Section V of the June 16, 2010 Settlement Agreement.

16. The assignment of indemnification rights made by the Assignors in the

Stipulation of Settlement was subsequently memorialized in the Assignment executed by the Assignors attached hereto as Exhibit A and incorporated herein by reference.

17. Pursuant to the assignment of the Assignors' indemnification claims, Plaintiffs are entitled to pursue, for the benefit of the Lu Class, recovery for all Losses incurred or sustained by the Assignors as set forth herein, including but not limited to the cash payment made by the State in settlement of the Lawsuit, attorneys' fees and costs incurred by the Assignors, and all damages suffered by the Assignors as alleged herein.

18. Defendants had actual notice of this claim for Losses (as defined above). Defendants had an opportunity to defend and indemnify Assignors from the claim for Losses, but they chose to remain silent. Defendants were specifically invited to participate in settlement negotiations between Plaintiffs and Assignors, but again chose not to participate. Defendants were notified of Assignors' election to compromise or settle Plaintiffs' claim against them for Losses, but Defendants failed to take timely action to defend and contest the same.

**PARTIAL SETTLEMENT OF DEFENDANTS' CLAIMS AGAINST OPPENHEIMER**

19. Assignors did not sue Defendants, but entered into a partial settlement with Defendants in June 2010. Defendants paid Assignors $67,310,000 in exchange for a general release of claims, but Assignors did not release: "Any claims by or liability to the Board and its members, the State of New Mexico and their officer and employees for indemnification pursuant to Section 12.2 of the Services Agreement, for any and all losses suffered by any Affected Plan Participant in his account who does not execute a Release Letter Releasing the OppenheimerFunds Released Parties, whether such claims are asserted by arbitration, action filed in any State or federal court, or otherwise."

20. Assignors suffered Losses related to Plaintiffs' claim and the settlement of those

5

claims, but Defendants have refused to make Assignors whole.

## OPPENHEIMER'S CONDUCT

21. During the Class Period as defined in the Lawsuit,[1] the overwhelming majority of the fixed income portion of Trust assets were invested in the Oppenheimer Core Bond Fund, the Oppenheimer Limited Term Government Fund and the Oppenheimer Strategic Income Fund.

22. The Trust's fixed income holdings performed miserably. In 2008, the Core Bond Fund lost 38.88%, compared to its benchmark, which earned 5.24%—a performance gap of over 44%. During that same time frame, the Limited Term Government Fund lost 6.01%, compared to its benchmark, which earned 8.41%—a performance gap of 14.42%, and the Strategic Income Fund lost 16.14%, compared to the Lehman Brothers Aggregate Bond Index which gained 5.24%, and the World Government Bond Index, which gained 10.89%. Against these indices, the Strategic Income Fund had a performance gap of 21 to 27%.

23. The reason for this shocking performance was not bad luck or the overall performance of the market. Even in a challenging market, the traditional, conservative fixed income benchmarks chosen by Oppenheimer managed to make money. The poor performance of the Trust's fixed income investments was directly caused by Oppenheimer's decision to scale down traditional conservative fixed income investments in favor of alternative, riskier, investments in the hope of seeking much higher returns, including dramatically increasing its use of leverage to purchase derivative instruments and highly volatile mortgage-related bonds.

24. Specifically, Oppenheimer began building Trust "fixed income" positions that were highly concentrated in four primary areas: AAA rated commercial mortgage-backed securities (CMBS); nonagency prime (jumbo) mortgages; AA and A rated financial-sector

---

[1] A Plaintiff class was certified under Rule 1-023 NMRA. "Class Period" refers to that certified class.

corporate bonds; and very short-maturity high-yield corporates. Each of those areas performed extremely poorly through the course of the year.

25. In 2008, Oppenheimer assumed management of the Scholar'sEdge Plan and recommended reallocating the portfolios of the Scholar'sEdge Plan to Oppenheimer products, including extensive new purchases of Core Bond Fund. On April 21, 2008, Oppenheimer purchased more than 24 million shares of Oppenheimer Core Bond Fund for the Plans, dramatically increasing the total shares owned by the State of New Mexico on behalf of the Plans' account holders. On September 22, 2008, Oppenheimer purchased several million new shares of Core Bond Fund, further increasing the total shares owned by the State of New Mexico on behalf of the Plan's account holders.

26. At the time Oppenheimer made these massive purchases, Oppenheimer was taking additional unnecessary risks by significantly increasing their fixed income funds' use of leverage. The increased use of leverage greatly increased the risk of loss. By the middle of 2008, the fixed income holdings had been leveraged to more than 180% of net assets on a dollar basis. Thus, for every dollar of capital in the fixed income holdings, account holders and the Trust were exposed to the credit-driven movement of more than $1.80 of securities. Such leverage, which is by definition highly risky, is anathema to the "conservative" purpose of a fixed income holding.

27. Oppenheimer continued to pursue risky and leveraged investments even after the stock market began crashing, largely due to massive market-wide MBS speculation and leverage. As Oppenheimer later admitted, "every time we bought something, it went down in price. And we'd buy it again, and it would go down in price. And we'd buy it again, and it would go down in price, to the point where right at the eve of the Bear Stearns episode in mid-March [2008], we were, for all intents and purposes, all in."

28. In late 2008 and early 2009, industry analysts began commenting on the devastating performance of several of the State's "fixed income" holdings purchased by Oppenheimer. Morningstar, Inc. analyst and fixed income specialist Eric Jacobsen investigated the devastating losses in the underlying fixed income holdings, writing: "What's been going on with Oppenheimer's bond funds has been so unbelievable that, well, we didn't believe it." Jacobsen concluded that the risks taken by the Core Bond Fund as described above were not disclosed or explained:

> The only thing worse than levering up a portfolio with 180%
> market exposure . . . is doing it quietly. I'd like to be wrong about
> this, but I can't imagine that the average shareholder or advisor
> with a stake in these funds knew that they were leveraged in any
> way. The word itself doesn't seem to be linked to any of the
> funds' strategies anywhere I've searched on Oppenheimer's Web
> site or in any of the supporting shareholder or marketing materials
> that we've seen. Terminology aside, none of the portfolio
> descriptors provides enough information to estimate those market
> exposures, much less know that they're not typical, 100 cents in,
> 100 cents invested. There's no indication whatsoever that anything
> is unusual about any of the funds that employ this kind of
> leveraged exposure. And it was never brought up by Oppenheimer
> managers in any of their recent Morningstar analyst interviews.

29. While the riskiness of the underlying fixed income holdings was not apparent to the general public, Oppenheimer was obligated to keep the Assignors fully informed concerning the Plans' operations, including the management and performance of the Trust's fixed income holdings.

30. Oppenheimer had unique information concerning the risks presented by highly-leveraged fixed income investments in vehicles such as AAA rated commercial mortgage-backed securities (CMBS), nonagency prime (jumbo) mortgages, AA and A rated financial-sector corporate bonds, and very short-maturity high-yield corporates. Oppenheimer knew or should have known that these risky investments were inappropriate Trust investments given the stated

8

objectives of the Trust, and that its high risk investment strategies were likely to lead to catastrophic losses.

31. Despite the enormous losses incurred by account holders and the Trust due to Oppenheimer's fixed income holdings, Oppenheimer continued to recommend to the State that it retain those investments. Finally, on February 17, 2009 (for the Scholar'sEdge Plan) and on March 2, 2009 (for the Education Plan), Defendants replaced the decimated Oppenheimer Core Bond Fund with the Dreyfus Bond Market Index Fund as the underlying holding for new general Oppenheimer Core Bond Fund for general fixed income assets deposited prior to March 2, 2009. The Oppenheimer Core Bond Fund continued to lose value throughout the first quarter of 2009, causing additional losses to the Trust and Plan enrollees.

32. Following these massive losses by the Trust, the Plans were ranked as the worst performing 529 college savings plans in 2008 among all plans offered by any State in the United States.

## COUNT I

33. Plaintiffs incorporate by reference into this cause of action the allegations of all paragraphs above, as if set forth herein.

34. The PMA is a valid, written contract between Assignors and Defendants. That contract also includes the covenant of good faith and fair dealing, pursuant to which Defendants were obligated to perform their obligations in good faith, *i.e.*, to act honestly and in accordance with standards of fair dealing under the surrounding circumstances.

35. Defendants breached the contract with Assignors, including its covenant of good faith and fair dealing.

36. Defendants' conduct, including that of Oppenheimer's officers, employees,

9

agents, representatives, delegates or subcontractors, constituted gross negligence, bad faith, and/or willful misconduct.

37. As a direct and proximate result of Oppenheimer's conduct, Assignors suffered, incurred, sustained and/or became subject to compensable Losses. Defendants agreed to indemnify Assignors against such Losses. Plaintiffs are entitled to pursue, for the benefit of the Lu Class, Assignors' rights of indemnification against Defendants pursuant to the assignment of those rights to Plaintiffs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that the Court:

a. Award damages in favor of Plaintiffs for the benefit of the Lu Class for all Losses sustained, incurred or sustained by Assignors, or to which any of them became subject, as a result of the Oppenheimer's conduct, in an amount to be proven at trial;

b. Award interest in favor of Plaintiffs for the benefit of the Lu Class on any monetary relief;

c. Award reasonable attorneys' fees and disbursements in favor of Plaintiffs and the Lu Class; and

d. Award equitable, injunctive and such further relief in favor of Plaintiffs and/or the Lu Class as the Court deems just and proper.

Respectfully submitted,

ROTHSTEIN, DONATELLI, HUGHES,
DAHLSTROM, SCHOENBURG & BIENVENU, LLP

*/s/ John C. Bienvenu*
John C. Bienvenu
Kristina Martinez
P.O. Box 8180
1215 Paseo de Peralta
Santa Fe, New Mexico 87504-8180
(505) 988-8004

KELLER ROHRBACK L.L.P.
Lynn Lincoln Sarko
T. David Copley
Amy Williams-Derry
Benjamin Gould
1201 Third Avenue, Suite 3200
Seattle, WA 98101
(206) 623-1900

*Attorneys for Plaintiffs*

## ASSIGNMENT

The Education Trust Board of New Mexico, The Education Plan Trust of New Mexico, and the State of New Mexico (collectively, "Assignors") hereby agree to assign certain rights and privileges to Ping Lu, Jill McKeon, Richard McKeon, Stephen Spencer, Spencer Stopa and Judy C. Winnegar, on behalf of themselves and a certified class of similarly situated persons ("Class") (collectively, "Assignees"), solely for the benefit of the Class, as set forth herein.

### I.
### RECITALS

1.  Assignees are enrollees in two education savings plans ("Plans"): "The Education Plan," and "The Scholar'sEdge Plan." The two Plans are substantially similar.

2.  On or around November 10, 2005, Assignors entered into a Program Management Agreement ("PMA") with OppenheimerFunds, Inc. ("OFI"), pursuant to which OFI agreed to serve as Program Manager to manage the Plans' investments. As Program Manager, OFI's duties include the duty to "invest and manage the assets of the Trust as investment agent of the Board ...." OFI later delegated its duties to a wholly owned subsidiary, OFI Private Investments, Inc. ("OFIPI"), but OFI also continued to remain responsible for the performance of such duties under the PMA. Another wholly owned subsidiary of OFI, OppenheimerFunds Distributor, Inc. ("OFDI"), provided distribution services for the Plans. (OFI, OFIPI and OFDI are collectively referred to hereinafter as "Oppenheimer.")

3.  On June 25, 2009, Assignees filed suit against Assignors pursuant to Rule 1-023 NMRA in the First Judicial District Court, County of Santa Fe, State of New Mexico, Case No. D-0101-CV-2009-02051 (the "Lawsuit").


EXHIBIT A

4. Through the claims and demands made by Assignees in the Lawsuit, Assignors have suffered, incurred, sustained and become subject to Losses from and against which Oppenheimer agreed to indemnify Assignors as set forth in Sections 12.1 and 12.2 of the PMA and section V of the June 16, 2010 Settlement Agreement between Assignors and Oppenheimer, including attorneys' fees and costs in the amount of approximately $1,219,439.44. Assignors have released Oppenheimer from certain claims, but have reserved those claims for indemnification identified in Section 12.2 of the PMA and section V of the June 16, 2010 Settlement Agreement between Assignors and Oppenheimer.

5. On October 7, 2013, Assignors and Assignees entered into a Stipulation of Settlement ("Stipulation of Settlement") pursuant to which they agreed to resolve the claims made in the Lawsuit for consideration of a cash payment by Assignors to Assignees in the amount of $3,750,000.00 and the assignment of indemnification rights set forth in this Assignment.

6. Assignees have acknowledged that Assignors have certain obligations to Oppenheimer under the PMA, including limited obligations of cooperation, and stipulated that nothing in this Assignment shall require Assignors to dishonor any obligations to Oppenheimer.

## II.
## ASSIGNMENT OF INDEMNIFICATION RIGHTS

7. For good and valuable consideration received, Assignors hereby transfer, assign and set over to Assignees all indemnification rights that any Assignor possesses against OFI, OFIPI and/or OFDI with respect to any and all Losses as defined in paragraph 4 of this Assignment and existing as of October 7, 2013, including but not

-2-

limited to rights of indemnification arising under Section 12.1 and 12.2 of the PMA and Section V of the June 16, 2010 Settlement Agreement.

## III.
## GOVERNING LAW

8. This Assignment will be subject to, governed by, and construed and enforced pursuant to the laws of New Mexico.

## IV.
## ENTIRE AGREEMENT

9. This Assignment and the Stipulation of Settlement and its attachments are the exclusive and final expression of all agreements by Assignors and Assignees with respect to this matter. The Parties have entered into this Assignment and the Stipulation of Settlement based solely upon their terms and not in reliance upon any representations or promises other than those contained in this Assignment and the Stipulation of Settlement. The terms of this Assignment may not be contradicted either by evidence of any prior or contemporaneous agreement or by the use of any form of extrinsic evidence whatsoever in any judicial, administrative, or other legal proceeding involving this Assignment.

\* \* \* \*

IN WITNESS WHEREOF, this Assignment has been duly executed as of the dates shown by below by the Assignors, acting through their duly authorized representatives.

Dated: 4/28/14/2014    THE EDUCATION TRUST BOARD OF NEW MEXICO

By: _____

Its: CHAIR

Dated: 4/28/14/2014    THE EDUCATION PLAN TRUST OF NEW MEXICO

By: _____

Its: CHAIR

Dated: May 2, 2014      THE STATE OF NEW MEXICO

By: _____

Its: Assistant Attorney General

-5-