

FILED
FIRST JUDICIAL
DISTRICT COURT

2009 DEC 21  PM 2: 57

STATE OF NEW MEXICO
COUNTY OF SANTA FE
FIRST JUDICIAL DISTRICT

Case No. D-0101-CV-2009- 02051

PING LU; JILL MCKEON, RICHARD MCKEON,
STEPHEN SPENCER, SPENCER STOPA; and
JUDY C. WINNEGAR, on their own behalf
and on behalf of a class of similarly
situated persons,

        Plaintiffs,

v.

THE EDUCATION TRUST BOARD
OF NEW MEXICO; THE EDUCATION
PLAN TRUST OF NEW MEXICO; and
THE STATE OF NEW MEXICO,

        Defendants.

## FIRST AMENDED CLASS ACTION COMPLAINT

      Plaintiffs Ping Lu, Jill McKeon, Richard McKeon, Stephen Spencer, Spencer Stopa and

Judy C. Winnegar (collectively, "Plaintiffs"), by and through below-signed counsel, bring this

First Amended Class Action Complaint against Defendants The Education Trust Board of New

Mexico, The Education Plan Trust of New Mexico, and the State of New Mexico (collectively,

the "State"). Plaintiffs allege against the State upon knowledge as to themselves and all matters

of public record, and upon information and belief as to all other matters, as follows:

### I. PARTIES

1.     Plaintiff Ping Lu ("Mr. Lu") is a resident of Bernalillo County, New Mexico.

- 1 -



EXHIBIT
2



Plaintiff Lu brings this action on his own behalf, on behalf of the designated beneficiaries of the education savings plans as set forth below,  and on behalf of a class of similarly situated persons.

2.     Plaintiff Jill McKeon ("Ms. McKeon") is a resident of Los Angeles County, California.  Ms. McKeon brings this action on her own behalf, on behalf of the designated beneficiaries of the education savings plans as set forth below, and on behalf of a class of similarly situated persons.

3.     Plaintiff Richard McKeon ("Mr. McKeon") is a resident of Los Angeles County, California.  Mr. McKeon brings this action on his own behalf, on behalf of the designated beneficiaries of the education savings plans as set forth below, and on behalf of a class of similarly situated persons.

4.     Plaintiff Stephen Spencer ("Mr. Spencer") is a resident of Sandoval County, New Mexico.  Plaintiff Spencer brings this action on his own behalf, on behalf of the designated beneficiaries of the education savings plans as set forth below, and on behalf of a class of similarly situated persons.

5.     Plaintiff Spencer Stopa ("Mr. Stopa") is a resident of Otero County, New Mexico. Plaintiff Stopa brings this action on his own behalf, on behalf of the designated beneficiaries of the education savings plans as set forth below, and on behalf of a class of similarly situated persons.

6.     Plaintiff Judy C. Winnegar ("Mr. Winnegar") is a resident of Santa Fe County, New Mexico.  Plaintiff Winnegar brings this action on her own behalf, on behalf of the designated beneficiaries of the education savings plans as set forth below, and on behalf of a class of similarly situated persons.

- 2 -

7.     Defendant the Education Trust Board of New Mexico ("Board") was established pursuant to the Education Trust Act, NMSA §21-21K-1 *et seq.* The Board is administratively attached to the Department of Higher Education and is a public instrumentality of the State of New Mexico. The Board is the governing body for the State of New Mexico's two tax-favored educations savings plans, commonly known as 529 Plans: The Education Plan and the Scholar'sEdge Plan (collectively referred to hereinafter as the "Plans"). The Board is responsible for making rules and regulations for the development and implementation of the Education Trust Act.

8.     Pursuant to 5.7.30.6 NMAC (2001), the purpose of the Education Trust Act is to "encourage persons to save and invest funds to be used by individual beneficiaries to pay the costs of attendance at eligible institutions of higher education and to establish a qualified tuition program pursuant to section 529 of the Internal Revenue Code of 1986, as amended and regulations promulgated thereunder."

9.     The Board administers The Education Plan and The Scholar'sEdge Plan. The Plans are maintained by the State of New Mexico.

10.     The Education Plan Trust of New Mexico ("Trust") is an education trust fund created, established and maintained by the Board pursuant to the Education Trust Act. Pursuant to a Declaration of Trust made as of September 25, 2000, the Trust is expressly empowered to sue or be sued in the name of the Trust.

11.     The Board is the Trustee of the Trust and is responsible for the ongoing management of the Trust assets in both Plans.

12.     As authorized by law and the State of New Mexico, the Board, acting on behalf of

- 3 -

the State of New Mexico, has entered into binding contracts, known as "college savings

investment agreements," or "customer agreements" with more than 100,000 investors. Under

these contracts, investors' savings are deposited in the Trust.

In investing and reinvesting Trust assets, the Board had a duty at all times material hereto "to act

with the care, skill and diligence, under the circumstances then prevailing, which would

characterize the actions of a prudent person who is acting as such a trustee and who is familiar

with the duties of such a trustee."

13.     The State of New Mexico, acting by and through the Board, hired Oppenheimer

Funds, Inc. ("OppenheimerFunds"), to serve as Program Manager of the Plans.  As Program

Manager, OppenheimerFunds provided a variety of services for the Board, the Trust and the

Plans, including administration, transfer agency, and record keeping and related services.  On

information and belief, OppenheimerFunds performed its services under the Board's direction.

Until April 30, 2008, OppenheimerFunds performed these services directly; after April 30, 2008,

OppenheimerFunds provided these Program Manager services though one of its controlled

affiliates, OFI Private Investments, Inc. ("OFI").In this Complaint, OppenheimerFunds and OFI

are referred to collectively as "Oppenheimer."  Oppenheimer is not a party to this action.

## II. STATEMENT OF FACTS

14.     All paragraphs above are incorporated herein by reference as if fully set forth in

this paragraph.

- 4 -

### *The Plans*

15.     This case involves two 529 Plans sponsored by the State: "The Education Plan" and "The Scholar'sEdge Plan." The two Plans are substantially similar, the primary difference being that "The Education Plan" is a "direct sold" plan (sold without a broker commission), while "The Scholar'sEdge Plan" is a "broker sold" plan (sold with a broker commission). Both Plans invest proceeds in the same Trust and are managed by the Board as Trustee. The Plans are college tuition savings programs created pursuant to Section 529 of the Internal Revenue Code of 1986, as amended. The Plans are established and maintained pursuant to New Mexico state law so that persons may save in a tax-advantaged manner for the purpose of paying qualified higher education expenses for designated beneficiaries such as the investors' children.

16.     Accounts established through investments in the Plans represent investments in municipal securities issued by the Trust.

### *The Plan Agreements are Binding Contracts Between the State and the Investor*

17.     Investors in both Plans sign a substantially identical contract with the State. For the Education Plan, the governing contract is the Education Plan Participation Agreement and Plan Description dated October 22, 2007, and as subsequently amended (the "Education Plan Agreement"). For The Scholar'sEdge Plan, the controlling contract is the Scholar'sEdge Participation Agreement and Plan Description dated October 22, 2007, and as subsequently amended (the "Scholar'sEdge Agreement").

18.     The Education Plan Agreement and the Scholar'sEdge Agreement (collectively, the "Agreements") constitute legally enforceable contracts between Plaintiffs and members of the Class, on the one hand, and the State, on the other hand.

19.     In the Agreements, the State offers Plan investors two basic options for the investment of their interest in the Trust.  Class members may request that their undivided interests in the Trust's assets be invested using either a "Custom Choice" Approach or an "Age Based" Approach.

### *The Plans' Custom Choice Approach*

20.     Under the State's Custom Choice Approach, Plan enrollees are given "the option to invest across the risk/reward spectrum from aggressive to conservative."  In simplest terms, Plan enrollees with high risk-tolerance are given the option of weighting their portion of Trust assets towards stocks, with their well-known higher risk and commensurately higher potential return.  Plan enrollees with low risk-tolerance are given the option of weighting their portion of Trust assets towards fixed-income investments, which are recognized as carrying lower risk and more modest returns.

21.     In both Plans, the State offers a range of Custom Choice options, referred to as portfolios: (1) the "Aggressive Portfolio" (100% equities); (2) the "Moderately Aggressive Portfolio" (80% equities and 20% fixed income); (3) the "Moderate Portfolio" (60% equities and 40% fixed income); (4) the "Conservative Portfolio" (40% equities, 50% fixed income and 10% money market); (5) the "Ultra Conservative Portfolio" (20% equities, 60% fixed income and 20% money market) ;  and (6) the "School Years Portfolio" (10% equities, 50% fixed income and 40% money market).

22.     In addition to the Custom Choice options listed above, each Plan offers some additional options.  The Education Plan's additional Custom Choice option is a "Short Term Yield Portfolio" (100% money market). The Scholar'sEdge Plan's additional Custom Choice

- 6 -

options include "Large-Cap Growth Portfolio," "Large Cap Core Portfolio," "Large Cap Value Portfolio," "Small Cap Core Portfolio," and "International Equity Portfolio" (each with 100% equities), "Intermediate Term Bond Portfolio" and "Diversified Income Portfolio" (100% fixed income), "Short Term Yield Portfolio" (100% money market), and "Capital Preservation Portfolio" (5% money market and 95% cash equivalent).

### *The Age Based Approach*

23.    Under the State's  Age Based Approach, Plan enrollees are given the chance to choose between "portfolios ranging from aggressive to conservative, which are designed to take into account the beneficiary's age." These portfolios are actively managed by the State: "As the beneficiary ages, the money in the account automatically shifts to increasingly conservative portfolios." The more conservative Age Based portfolios are represented as "seek[ing] to preserve capital as the expected time for disbursement approaches."

24.    In both Plans, the State invests enrollees' money in specific Age-Based portfolios based on the age of the expected beneficiary. The State invests Trust assets in more aggressive portfolios for younger beneficiaries, and moves Trust assets into progressively more conservative portfolios as the beneficiary ages. The Age Based portfolios, listed from most aggressive to most conservative, are: (1) the "Newborn to Age 5 Portfolio" (100% equities); (2) the "Ages 6-8 Portfolio" (80% equities and 20% fixed income); (3) the "Ages 9-11 Portfolio" (60% equities and 40% fixed income); (4) the "Ages 12-14 Portfolio" (40% equities, 50% fixed income and 10% money market); (5) the "Ages 15-17 Portfolio" (20% equities, 60% fixed income and 20% money market); and (6) the "Ages 18 and Over Portfolio" (10% equities, 50% fixed income and 40% money market).

25.   The underlying funds and target allocations for the aforementioned Custom Choice portfolios (1) – (6) correspond to the underlying funds and target allocations of the aforementioned Age Based portfolios (1) – (6).

### *The Special Nature of the Trust*

26.   The Plans and the Trust exist for the special purpose of helping Plan enrollees save money for a specified beneficiary's higher education.  This specific purpose sets the context for the expectations and duties of the parties to the Agreements.  For example, if an enrollee enters into an Agreement with the State to establish an Age-Based account for her daughter, then age 8, the State agrees to invest those Trust assets, following the Plan, with the expectation that the Trust proceeds will start being used when the daughter reaches college age – in this example, about 10 years after Plan enrollment.  This is a very specific investment goal: both parties to the Agreement know that the Trust assets will be needed in a small window of time about 10-15 years after the enrollment date.

27.   This is not a long-term or open-ended investment such as retirement savings.  In a true long-term investment, it is sometimes possible to "wait out" a dip in the market.  But here, Plan enrollees cannot "wait out" mismanagement of Trust assets unless the intended beneficiary foregoes her higher education – which would defeat the entire purpose of the Trust.

28.   The State knew or had reason to know of the special nature of the Trust, as stated in the Agreements.

### *The State Controlled All Trust Investments*

29.   By making an initial selection of a Custom Choice Approach (and a portfolio offered within that Approach), Plan enrollees have an opportunity to express their preference for

a range of investment styles, from aggressive to conservative. For Plan enrollees who express a preference for a conservative or balanced investment approach, the State is obligated to prudently invest Trust assets to achieve the promised level of risk and reward. For example, Plan enrollees who select the Conservative or Ultra Conservative Portfolio are entitled to expect that that State would invest Trust assets conservatively.

30.   By making an initial selection of an Age Based Approach, Plan enrollees express their preference for an investment that the State would actively manage and rebalance over time into increasingly conservative holdings. A Plan enrollee with a young child would initially have his or her Trust interest invested in 100% equities, knowing that over time the State would reinvest Trust assets into conservative fixed income and money market holdings. For Plan enrollees who express a preference for an Age Based Approach, the State is obligated to prudently invest Trust assets to achieve the promised level of risk and reward, decreasing Trust holdings in higher-risk equities and increasing Trust holdings in lower-risk fixed income vehicles. For example, Plan enrollees with teenage beneficiaries are entitled to expect that that State would invest Trust assets extremely conservatively.

31.   Plan enrollees choose an Approach, and in some instances, a specific Portfolio, but they do not purchase any of the Trust's underlying holdings.  The Agreements are emphatic:

> Account Owners own interests in a Portfolio; they do not have a direct beneficial interest in the mutual funds or the other instruments. [Education Fund Plan Description at 14; Scholars' Edge Agreement at 14]

> Account Owners do not have a direct beneficial interest in the underlying mutual funds and other investments held by the Portfolio(s), and therefore Account Owners do not have the rights of an owner or shareholder of such mutual funds or other investments. [Education Plan Agreement, Art. II § 8;

- 9 -

Scholars' Edge Agreement, Art. II § 8]

32.   Plan enrollees have no control over the composition of the Portfolios or the Portfolios' underlying holdings:

> No Account Owner, Designated Beneficiary or contributor may direct the investment of and Contributions or any earnings thereon either directly or indirectly, other than to select from the available portfolios prior to a contribution. In addition, Account Owners may not choose the underlying funds in which a Portfolio invests. [Education Plan Agreement, art. II § 7; Scholars' Edge Agreement, art. II § 7]

33.   Indeed, the Portfolios and their holdings are transient: the Board retains authority to change the Portfolios, and the holdings of the Portfolios, at any time:

> [A]ny Portfolio may at any time be merged, terminated, reorganized, or cease accepting new contributions; . . . any such action affecting a Portfolio may result in contributions being reinvested in a Portfolio different from the Portfolio in which contributions were originally invested; and . . . the Board and the Program Manager may at any time terminate or modify the Portfolio fee structures. [Education Plan Agreement, Art. VI § 2(*i*); Scholars' Edge Agreement, Art. VI § 2(*i*)]

> The Board reserves the right at any time, among other things, to: . . . Add, subtract, terminate or merge Portfolios, or change the Portfolios included in the Age Based Approach, the asset allocation of the Portfolios, or the Underlying Funds in which any Portfolio invests. [Education Fund Plan Description, at p. 13; Scholars' Edge Agreement, at p. 14]

> The Board reserves the right to change the investment objectives and policies of the Portfolios, to change the type and number of Portfolios that are available, and to change or eliminate target allocations and mutual fund investments at its discretion. [Education Fund Plan Description, at 13; Scholars' Edge Agreement, at 14]

## *The Trust's "Fixed Income" Assets*

34.   This lawsuit concerns the State's mismanagement of certain Trust "fixed income" assets, in breach of the Agreements.  Plaintiffs do not allege mismanagement or seek damages or equitable relief related to the State's management of Trust assets invested directly or indirectly in equities, money markets or cash equivalents.  To the extent any enrollee's interest in the Trust was directed exclusively to equities, money market or cash equivalents throughout the Class Period, he or she is not a member of the defined Class.

35.   The State promised that the Trust's fixed income assets would be managed in a conservative and prudent manner.  For example, the Moderately Aggressive Portfolio, Ages 6-8 Portfolio, Moderate Portfolio, and Ages 9-11 Portfolio distinguished between "conservative" fixed income investments and "aggressive" equity investments.

36.   The State marketed the Conservative Portfolio and Ages 12-14 Portfolio as "invest[ing] in a combination of conservative and aggressive instruments in order to seek the Portfolio's objectives of capital appreciation and income."

37.   The State marketed the Ultra Conservative Portfolio and Ages 15-17 Portfolio as "invest[ing] in fixed income and equity investments in order to seek the Portfolio's objectives of income and conservative appreciation.  This Portfolio seeks preservation of capital with minimal growth by investing primarily in fixed income funds in an effort to maintain stability."

38.   The State marketed the School Years Portfolio and 18 and Over Portfolio as "invest[ing] in fixed income investments in order to seek the Portfolio's objectives of income and principal protection.  This Portfolio seeks preservation of capital with growth as a secondary objective, investing primarily in fixed income funds to maintain stability."

39.     The State marketed the Intermediate Term Bond Portfolio as "seek[ing] high current income consistent with preservation of principal."

40.  .  . During the Class Period, the State invested the overwhelming majority of the fixed income portion of Trust assets in the Oppenheimer Core Bond Fund, the Oppenheimer Limited Term Government Fund, and the Oppenheimer Strategic Income Fund.

41.     The Trust's fixed income holdings performed miserably.  In 2008, the Core Bond Fund lost 38.88%, compared to its benchmark, which earned 5.24% -- a performance gap of over 44%.  During that same time frame, the Limited Term Government Fund lost 6.01%, compared to its benchmark, which earned 8.41% -- a performance gap of 14.42%, and the Strategic Income Fund lost 16.14%, compared to the Lehman Brothers Aggregate Bond Index which gained 5.24%, and the World Government Bond Index, which gained 10.89%.  Against these indices, the Strategic Income Fund had a performance gap of 21 to 27%.

42.     The reason for this shocking performance was not bad luck or the overall performance of the market.  Even in a challenging market, the fixed income benchmarks that the State selected as fair comparators managed to *make* money. Instead the State's fixed income holdings imploded because the State, presumably upon the advice of its Program Manager, placed and retained Trust assets in "fixed income" holdings that were the very opposite of traditional, conservative investments.

43.     Moreover, beginning in 2007 and continuing through 2008, the State and its Program Manager altered the investment style and risk profile of the Trust's fixed income holdings, and began to significantly increase its risk.  Most significantly, the State and its Program Manager began to seek alternative, riskier, investments in the hopes of seeking much

- 12 -

higher returns, including dramatically increasing its use of leverage to purchase derivative instruments and highly volatile mortgage-related bonds.

44.     Specifically, beginning in January 2008, the State and its Program Manager began building Trust "fixed income" positions that were highly concentrated in four primary areas: AAA rated commercial mortgage-backed securities (CMBS); nonagency prime (jumbo) mortgages; AA and A rated financial-sector corporate bonds; and very short-maturity high-yield corporates.  Each of those areas performed extremely poorly through the course of the year.

45.     In addition, the State and its Program Manager began to take additional unnecessary risks by significantly increasing the Trust's use of leverage.  The increased use of leverage greatly increased the risk of loss.  By the middle of 2008, the Trust fixed income holdings had been leveraged to more than 180% of net assets on a dollar basis.  Thus, for every dollar of Class member capital in the Trust's fixed income holdings, the Trust was exposed to the credit-driven movement of more than $1.80 of securities.  Such leverage, which is by definition highly risky, is anathema to the "conservative" purpose of a fixed income holding.

46.     By virtue of the conduct alleged herein, the Trust's fixed income holdings became unsuitable and violated the State's Agreements with Plaintiffs and members of the proposed class.

47.     When the stock market began crashing, largely due to massive MBS speculation and leverage, the Board and the Trust "doubled down," intentionally taking on even more leverage and risk in the Trust holdings that were supposed to be "conservative."  As the Plan Manager stated: "every time we bought something, it went down in price.  And we'd buy it again, and it would go down in price.  And we'd buy it again, and it would go down in price, to

- 13 -

the point where right at the eve of the Bear Stearns episode in mid-March [2008], we were, for all intents and purposes, all in."

48.    In late 2008 and early 2009, industry analysts began commenting on the devastating performance of several of the State's "fixed income" holdings. Morningstar, Inc. analyst and fixed income specialist Eric Jacobsen investigated the devastating losses in the underlying fixed income holdings, writing: "What's been going on with Oppenheimer's bond funds has been so unbelievable that, well, we didn't believe it." Jacobsen concluded that the risks taken by the Core Bond Fund as described above were not known to average investors: "The only thing worse than levering up a portfolio with 180% market exposure ... is doing it quietly. I'd like to be wrong about this, but I can't imagine that the average shareholder or advisor with a stake in these funds knew that they were leveraged in any way. The word itself doesn't seem to be linked to any of the funds' strategies anywhere I've searched on Oppenheimer's Web site or in any of the supporting shareholder or marketing materials that we've seen. Terminology aside, none of the portfolio descriptors provides enough information to estimate those market exposures, much less know that they're not typical, 100 cents in, 100 cents invested. There's no indication whatsoever that anything is unusual about any of the funds that employ this kind of leveraged exposure. And it was never brought up by Oppenheimer managers in any of their recent Morningstar analyst interviews."

49.    While the riskiness of the underlying fixed income holdings was not apparent to the general public, the State had special access to information about the holdings, and Board members are sophisticated Trustees with formidable financial experience and expertise.

Throughout the Class Period, The Board and the Trust knew or had reason to know information concerning the management and performance of the Trust's fixed asset holdings. On information and belief, the Program Manager kept the Board fully informed concerning the Plan's operations, including the management and performance of the Trust's fixed income holdings. At least quarterly, the Program Manager provided the Board and the Trust with detailed, formal reports.

50.     Rather than disinvest from the riskiest of the Trust's fixed income holdings (the Core Bond Fund), the State massively *increased* the percentage allocations and total investments in that risky holding, even in the most conservative portfolios. On April 21, 2008, the State changed the allocations of the Scholar'sEdge portfolios, and then several months later, on September 22, 2008, the State changed the allocations of the Education Plan portfolios.

51.     At the time the State reallocated the portfolios and made these massive new investments in risky, highly leveraged fixed income holdings, the financial markets were already in turmoil. The State knew or should have known that these high risk investment strategies were likely to lead to catastrophic losses.

52.     Immediately after the State "doubled down" on these risky, highly leveraged fixed income holdings, the risks came to further fruition: the Trust's fixed income holdings suffered catastrophic decline in value. By the end of 2008, the Plan portfolios values crumbled, with dramatic losses in the portfolios that were supposed to be the most conservative:

| Portfolios | Scholar'sEdge | Education Plan |
|---|---|---|
| Moderately Aggressive/Ages 6-8: | N/A | − 39.16 % |
| Moderate/Ages 9-11: | − 39.35 % | − 36.31 % |
| Conservative/Ages 12-14: | − 34.88 % | − 35.95 % |
| Ultra Conservative/Ages 15-17: | − 26.39 % | − 26.21 % |
| School Years/Ages 18 and Over: | − 20.86 % | − 19.05 % |
| Intermediate Term Bond: | − 38.85 % | N/A |

53.     On February 17, 2009 (for the Scholar'sEdge Plan) and on March 2, 2009 (for the Education Plan), the State belatedly replaced the decimated Core Bond Fund with the Dreyfus Bond Market Index Fund as the underlying holding for new general fixed income investments in the Trust. However, the Trust continued to hold, and still holds, interests in the Core Bond Fund for general fixed income assets deposited prior to March 2, 2009. Sadly, the Core Bond Fund continued to lose value throughout the first quarter of 2009, causing additional losses to Plan enrollees who contracted with the State for a conservative fixed income investment.

54.     Following these massive losses by the Trust, the Plans were ranked as the worst performing 529 college savings plans in 2008 among all plans offered by any State in the United States.

### III. <u>CLAIMS OF THE NAMED PLAINTIFFS</u>

55.     All paragraphs above are incorporated herein by reference as if fully set forth in this paragraph.

#### <u>Ping Lu</u>

56.     Ping Lu purchased shares in the Trust on behalf of his three minor children in order to save for their college educations. Mr. Lu enrolled in the Education Plan. Mr. Lu selected the Age Based portfolios for all three of his children. He made regular contributions to each of the three accounts every year between 2003 and the present.

57.     For his oldest son, the State automatically moved Mr. Lu's Trust interests from the Ages 9-11 Portfolio to the Ages 12-14 Portfolio on December 20, 2005. The State unilaterally reallocated the investments in that account effective September 22, 2008.

58.    For his daughter, the Board automatically moved Mr. Lu's Trust interests from the Ages 9-11 Portfolio to the Ages 12-14 Portfolio on December 29, 2007. The State unilaterally reallocated the investments in that account effective September 22, 2008.

59.    For his youngest son, the State automatically moved Mr. Lu's Trust interests from the Newborn to Age 5 Portfolio to the Ages 6-8 Portfolio on April 20, 2006. The State unilaterally reallocated the investments in that account effective September 22, 2008.

60.    All three of Mr. Lu's Plan accounts suffered severe losses in 2008 and continuing to the present. The total amount of losses is estimated at no less than $60,000 to date.

**Jill and Richard McKeon**

61.    Jill McKeon purchased shares in the Trust in 2006 on behalf of her minor daughter in order to save for her college education. Ms. McKeon enrolled in The Scholar'sEdge Plan. Ms. McKeon selected the Age-Based Portfolio for her daughter, because she was close to college age, and she wanted the money invested conservatively. She made regular contributions to her daughter's account between 2006 and the present.

62.    Based on her daughter's birth date, the State assigned the account to the "Ages 15-17 Years Portfolio."

63.    The State unilaterally reallocated the investments in that account effective April 21, 2008.

64.    Richard McKeon purchased shares in the Trust in 2006 on behalf of his minor daughter in order to save for her college education. Mr. McKeon enrolled in The Scholar'sEdge Plan. Mr. McKeon selected the Age-Based Portfolio for his daughter pre-teen daughter. He made regular contributions to his daughter's account between 2006 and the present.

- 17 -

65.   Based on his daughter's birth date, the State originally invested the account under the "Ages 9-11 Years Portfolio."

66.   The State unilaterally reallocated the investments in that account effective April 21, 2008. On November 3, 2008, the State automatically moved Mr. McKeon's Trust interests from the Ages 9-11 Portfolio to the Ages 12-14 Portfolio.

67.   Both Mr. and Mrs. McKeon's accounts for their minor children suffered severe losses in 2008 and continuing to the present. The total amount of losses is estimated at no less than $10,000 to date. The McKeon's older daughter is scheduled to enroll in a four-year university in the fall of 2009, and the family's ability to pay for her college education has been severely impacted by the State's actions alleged herein.

**Stephen Spencer**

68.   Stephen Spencer purchased shares in the Trust in May 2008 on behalf of his two minor children in order to pay for their college educations. Mr. Spencer enrolled in The Education Plan. Mr. Spencer selected the Age-Based Portfolios for both of his children, because he wanted the money invested conservatively for his teenage children. He made regular contributions to both accounts between May 2008 and the present.

69.   Based on his childrens' birth dates, the State assigned both of Mr. Spencer's accounts to the "Ages 15-17 Years Portfolio."

70.   The State unilaterally reallocated the investments in that account effective September 22, 2008.

71.   Both of Mr. Spencer's Plan accounts suffered severe losses in 2008 and continuing to the present. The total amount of losses is estimated at no less than $6,000 to date.

**Spencer Stopa**

72.     Spencer Stopa purchased shares in the Trust on behalf of his minor daughter in order to save for her college education. Mr. Stopa chose to invest in the Education Plan. He selected the "Conservative" portfolio because he wanted a safe, conservative investment vehicle that would protect and grow his account for when his daughter was expected to begin her college education in the fall of 2008.   He made regular contributions to the account beginning in 2002.

73.     The State unilaterally reallocated the investments in Mr. Stopa's account effective September 22, 2008.

74.     Mr. Stopa's account suffered severe losses in 2008 and continuing until the present.   The total amount of losses is estimated at no less than $3,500 to date.  Mr. Stopa's daughter began college in the Fall of 2008 and the substantial losses in his account have severely impacted Mr. Stopa's ability to pay for her tuition expenses.

**Judy Winnegar**

75.     Judy Winnegar and her husband purchased shares in the Trust on behalf of her two minor children in order to save for their college educations.  Ms. Winnegar chose to invest in the Education Plan, and selected the Custom Choice Approach for both of her children.  Ms. Winegar made regular contributions to both accounts every year between 2004 and the present.

76.     As both of their children approached college age, Ms. Winnegar and her husband moved all of accounts into the "Conservative" portfolio in order to ensure that the funds would be protected and would be available to pay for the childrens' college educations.

77.     The State unilaterally reallocated the investments in Ms. Winnegar's accounts effective September 22, 2008.

78.     Both of Ms. Winnegar's accounts suffered severe losses in 2008 and thereafter until they were able to move all of their accounts from the Conservative portfolios in January 2009. The total amount of losses is estimated at no less than $26,000 to date. Both of Ms. Winnegar's children are in college now and the substantial losses in these accounts have severely impacted Ms. Winnegar's and her husband's ability to pay for their childrens' tuition expenses.

## IV.  DAMAGES

79.     All paragraphs above are incorporated herein by reference as if fully set forth in this paragraph.

80.     As a direct and proximate result of the wrongful and unlawful actions described above, Plaintiffs and the members of the Class were injured and have suffered and continue to suffer damages, including but not limited to losses in their Plan accounts as set forth above.

81.     Plaintiffs estimate that the total losses suffered by the Class are in excess of $175 million.

## V.  CLASS ACTION ALLEGATIONS

82.     The paragraphs above are incorporated herein by reference as if fully set forth in this paragraph.

83.     This civil action is brought by Plaintiffs on their own behalf, on behalf of the designated beneficiaries of the Plans, and on behalf of a class of similarly situated persons, pursuant to SCRA 1-023. The putative class is defined as:  All persons who entered into or maintained an Education Plan Participation Agreement or a Scholars' Edge Plan Participation Agreement, at any time between June 25, 2007 and June 25, 2009, and who suffered losses related to the Trust's fixed income assets as alleged herein, and their designated beneficiaries

(hereinafter, the "Class"). Excluded from the Class are the individual Board members and members of their immediate families and their legal representatives, beneficiaries, heirs, successors or assigns.

84.  Plaintiffs reserve the right to amend this definition, including the right to add subclasses, as litigation proceeds.

85.  Plaintiffs are members of the Class they seek to represent, and have standing to bring this action.

86.  The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are more than 100,000 members in the proposed Class.

87.  Plaintiffs' claims are typical of the claims of the members of the Class. All members of the Class are subject to the same contract rights and obligations vis-à-vis the State.

88.  Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class litigation.

89.  Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact that are common to the Class are:

a.  The extent and nature of the State's contractual duties under the Agreements;

b.  The extent and nature of the State's contractual duty of good faith and fair dealing;

c.  Whether the State's acts and omissions as alleged herein breached their duties

under the Agreements;

d.    Whether the Class has sustained damages arising from the State's breaches of the

Agreements; and

e.    The proper measure of damages recoverable by the Class.

90.    A class action is superior to all other available methods for the fair and efficient

adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as

the damages suffered by individual Class members may be relatively small in relation to the

expense and risk of litigation, it is not practicable for members of the Class to individually seek

redress for the wrongs done to them.  There will be no difficulty in the management of this action

as a class action.

## VI.  FIRST CAUSE OF ACTION
### (Breach of Contract)

91.    Plaintiffs incorporate by reference into this cause of action the allegations of all

paragraphs above, as if set forth herein.

92.    The Agreements constitute legally enforceable contractual agreements.  These

Agreements include the covenant of good faith and fair dealing, pursuant to which the State is

obligated to perform its obligations in good faith, *i.e.,* to act honestly and in accordance with

standards of fair dealing under the surrounding circumstances.  In addition, the Agreements

included the obligation for the State "to act with the care, skill and diligence, under the

circumstances then prevailing, which would characterize the actions of a prudent person who is

acting as such a trustee and who is familiar with the duties of such a trustee."

93.    By its acts and omissions as alleged above, the State breached its Agreements

- 22 -

with Plaintiffs and the Class, including its covenant of good faith and fair dealing.

94.   As a direct and proximate result of the State's breach of contract, Plaintiffs and the Class suffered compensable damages.

## VII. SECOND CAUSE OF ACTION
### (Declaratory and Injunctive Relief)

95.   Plaintiffs incorporate by reference into this cause of action the allegations of all paragraphs above, as if fully set forth herein.

96.   Plaintiffs and members of the Class have been and will be irreparably injured in the future by the State's misconduct.

97.   Plaintiffs, on behalf of themselves and the members of the Class, seek a judgment declaring that each respective Defendant must cease the wrongful conduct described herein, and entering affirmative and negative injunctions as appropriate to enjoin further violations of the Plaintiffs' rights and other equitable relief as may be proper in the premises.

98.   Plaintiffs and members of the Class do not have a plain, adequate, speedy, or complete remedy at law to address the wrongs alleged in this Complaint, and they will suffer irreparable injury as a result of the State's misconduct unless injunctive and declaratory relief is granted.

99.   By reason of the foregoing, Plaintiffs and members of the Class are entitled to declaratory and injunctive relief as set forth above.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that the Court:

A.   Determine that this action is a proper class action, appointing the named Plaintiffs

herein as Class Representatives under SCRA Rule 1-023, and appointing

Plaintiffs' Counsel herein as Counsel for the Class under SCRA Rule 1-023;

B.  Award compensatory damages in favor of Plaintiffs and the other Class members

for all damages and other economic loss sustained as a result of the State's

wrongdoing, in an amount to be proven at trial, including interest thereon;

C.  Award Plaintiffs and the Class their reasonable costs and expenses incurred in this

action, including attorneys' fees, pursuant to the common fund doctrine; and

D.  Award equitable, injunctive and such further relief as the Court deems just and

proper.

Respectfully submitted,

ROTHSTEIN, DONATELLI, HUGHES
DAHLSTROM, SCHOENBURG & BIENVENU, LLP

By: _____
John C. Bienvenu
Robert R. Rothstein
Mark H. Donatelli
Donna M. Connolly
Post Office Box 8180
Santa Fe, New Mexico 87504-8180
(505) 988-8004

KELLER ROHRBACK LLP

Lynn Lincoln Sarko
T. David Copley
Amy Williams-Derry
1201 Third Avenue, Suite 3200
Seattle, WA 98101
(206) 623-1900

*Attorneys for Plaintiffs*

- 24 -

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 21st day of December, 2009, I caused to be delivered a

true and correct copy of the foregoing on the following counsel by U.S. mail, postage prepaid:

Gary K. King and Matthew E. Jackson
New Mexico Attorney General
P.O. Drawer 1508
Santa Fe, NM 87504-1508

James W. Canup
529 Counsel, PLC
7202 Glen Forest Drive, Suite 204
Richmond VA 23226

Joseph Goldberg
John W. Boyd
David W. Urias
Freedman Boyd Hollander
Goldberg Ives & Duncan, P.A.
20 First Plaza, Suite 700
Albuquerque, NM 87102

Joshua B. Silverman
Pomerantz Haudek Grossman & Gross LLP
10 South LaSalle Street, Suite 3500
Chicago, IL 60603

John C. Bienvenu