**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

**PING LU; JILL MCKEON; RICHARD MCKEON;
STEPHEN SPENCER; SPENCER STOPA; and
JUDY C. WINNEGAR,**

        **Plaintiffs,**

    **v.**　　　　　　　　　　　　　　　　**No. 1:14-cv-00618-JB-RHS**

**OPPENHEIMERFUNDS, INC.; OFI
PRIVATE INVESTMENTS, INC.; and
OPPENHEIMERFUNDS DISTRIBUTOR, Inc.,**

    **Defendants.**

**<u>PLAINTIFFS' RESPONSE TO OFI'S
MOTION TO DISMISS THE FIRST AMENDED COMPLAINT</u>**

Plaintiffs Ping Lu, Jill McKeon, Richard McKeon, Stephen Spencer, Spencer Stopa and

Judy C. Winnegar (collectively, "Plaintiffs"), by and through below-signed counsel, hereby

submit their response to OFI's Motion to Dismiss the First Amended Complaint (Doc. 21) filed

by Defendants OppenheimerFunds, Inc., OFI Private Investments, Inc., and OppenheimerFunds

Distributor, Inc. (collectively, "Defendants" or "Oppenheimer").

## I.   INTRODUCTION

This is an action brought by the Plaintiffs as the Assignees of indemnification claims

against Defendants.  These indemnification claims were assigned to the Plaintiffs by the State of

New Mexico ("State") and its instrumentalities, the Education Trust Board of New Mexico

("Board") and the Education Plan Trust of New Mexico (collectively, "Assignors").  As

Assignees, Plaintiffs are standing in the shoes of the Assignors and asserting claims that the

Assignors possessed against the Defendants for indemnification of losses sustained by the

Assignors.

Having removed this action to federal court, the Defendants now seek to dismiss the complaint for failure to state a claim.  As set forth below, there is no basis for dismissal.

## II.  FACTUAL BACKGROUND

The following facts are taken from the allegations in the First Amended Complaint (Doc. 2-1) (hereinafter "Amended Complaint"), which are presumed to be true for the purposes of the Court's consideration of the Motion to Dismiss.  *Kerber v. Qwest Group Life Ins. Plan*, 647 F.3d 950, 959 (10th Cir. 2011).

Plaintiffs bring this action as Assignees of claims that Assignors have against Defendants.  *See* Amended Complaint 2, ¶ 7.  "Plaintiffs hold the assigned claims on behalf of themselves and a class certified in New Mexico State Court (the "Lu Class"), but this case against Defendants is not brought as a class action or collective action."  *Id.*

The assigned claims arise from a Program Management Agreement ("PMA") between the State, through the Board, and Defendants that was entered on or around November 10, 2005. *Id.* 2, ¶ 9; *see also* PMA (Doc. 22-2).  Pursuant to the PMA, Defendants agreed to serve as Program Manager of New Mexico's two tax-favored educations savings plans, commonly known as 529 Plans: The Education Plan and the Scholar'sEdge Plan (the "Plans").  Amended Complaint at 2, ¶ 9.  "As Program Manager, Defendants' duties included the duty to "invest and manage the assets of the Trust as investment agent of the Board . . . ."  *Id.* (quoting PMA). Defendants also undertook the duties of "[r]ecommending Plan investments for Board review and approval" and "[r]eporting to the Board quarterly and annually; and reserved "the right to alter the management, operation, and all other matters relating to the ongoing business of the

underlying funds offered though the Plans without receiving the consent of the Board." *Id.* at 2-3, ¶ 10(a), (b), (c).

The PMA provides that Defendants are liable to the Assignors under certain circumstances:

> OFI and OFDI will be liable, jointly and severally, to the Board and its members, the Treasurer, the State and their officers and employees for any and all losses, damages, costs, claims, liabilities, penalties, demands and expenses (including, without limitation, reasonable attorneys' fees and disbursements) (collectively called "Losses") suffered, incurred, or sustained by the Board and its members, the Treasurer, the State and their officers and employees, or to which the Board and its members, the Treasurer, the State and their officers and employees becomes subject, to the extent resulting from, arising out of or relating to a material breach by OFI or OFDI of their duties, obligations, representations, warranties or covenants under this Agreement or any gross negligence, bad faith, willful misconduct, fraud of OFI or OFDI or their officers, employees, representatives, delegates, subcontractors or agents . . . .

*Id.* at 3, ¶ 10(d).  The PMA further provides that Defendants agree to indemnify Assignors for any losses caused by Defendants:

> OFI and OFDI will indemnify, defend and hold harmless the Board and its members, the Treasurer, the State and their officers and employees (collectively, the "Plan Indemnitees") from and against for any and all Losses suffered, incurred, or sustained by the Plan Indemnitees or to which any of them becomes subject, to the extent resulting from, arising out of or relating to a breach of this Agreement or constituting gross negligence, bad faith, willful misconduct or fraud by OFI or OFDI or their officers, employees, agents, representatives, delegates or subcontractors of their duties under this Agreement . . . .

*Id.* ¶ 10(e).  "The PMA is governed by New Mexico law."  *Id.* ¶ 11.

During the relevant time period, "the overwhelming majority of the fixed income portion of Trust assets were invested in the Oppenheimer Core Bond Fund, the Oppenheimer Limited Term Government Fund and the Oppenheimer Strategic Income Fund."  *Id.* at 6, ¶ 21.  "The Trust's fixed income holdings performed miserably."  *Id.* ¶ 22.

In 2008, the Core Bond Fund lost 38.88%, compared to its benchmark, which earned 5.24%—a performance gap of over 44%. *See id.* During that same time frame, the Limited Term Government Fund lost 6.01%, compared to its benchmark, which earned 8.41%—a performance gap of 14.42%, and the Strategic Income Fund lost 16.14%, compared to the Lehman Brothers Aggregate Bond Index which gained 5.24%, and the World Government Bond Index, which gained 10.89%. Against these indices, the Strategic Income Fund had a performance gap of 21 to 27%.

*See id.*

"The reason for this shocking performance was not bad luck or the overall performance of the market," *id.* ¶ 23, but instead was directly caused by Defendants' "decision to scale down traditional conservative fixed income investments in favor of alternative, riskier, investments in the hope of seeking much higher returns, including dramatically increasing its use of leverage to purchase derivative instruments and highly volatile mortgage-related bonds. " *Id.*

In 2008, Defendants "assumed management of the Scholar'sEdge Plan and recommended reallocating the portfolios of the Scholar'sEdge Plan to Defendants' products, including extensive new purchases of Core Bond Fund, . . . [and] dramatically increasing the total shares owned by the State on behalf of the Plans' account holders." *Id.* at 7, ¶ 25. At the time Defendants made these massive purchases, Defendants took "additional unnecessary risks by significantly increasing their fixed income funds' use of leverage," which greatly increased the risk of loss. *Id.* ¶ 26. "By the middle of 2008, the fixed income holdings had been leveraged to more than 180% of net assets on a dollar basis." *Id.* "Such leverage, which is by definition highly risky, is anathema to the 'conservative' purpose of a fixed income holding." *Id.*

Defendants "continued to pursue risky and leveraged investments even after the stock market began crashing, largely due to massive market-wide MBS speculation and leverage." *Id.* ¶ 27. As Defendants later admitted:

every time we bought something, it went down in price.  And we'd buy it again, and it would go down in price.  And we'd buy it again, and it would go down in price, to the point where right at the eve of the Bear Stearns episode in mid-March [2008], we were, for all intents and purposes, all in.

*Id.*

"In late 2008 and early 2009, industry analysts began commenting on the devastating performance of several of the State's 'fixed income' holdings purchased by' Defendants.  *Id.* at 8, ¶ 28.  "Morningstar, Inc. analyst and fixed income specialist Eric Jacobsen investigated the devastating losses in the underlying fixed income holdings, writing: 'What's been going on with Oppenheimer's bond funds has been so unbelievable that, well, we didn't believe it.'"  *Id.* Jacobsen concluded that the risks taken were not disclosed or explained:

The only thing worse than levering up a portfolio with 180% market exposure . . . is doing it quietly.  I'd like to be wrong about this, but I can't imagine that the average shareholder or advisor with a stake in these funds knew that they were leveraged in any way.  The word itself doesn't seem to be linked to any of the funds' strategies anywhere I've searched on Oppenheimer's Web site or in any of the supporting shareholder or marketing materials that we've seen.  Terminology aside, none of the portfolio descriptors provides enough information to estimate those market exposures, much less know that they're not typical, 100 cents in, 100 cents invested.  There's no indication whatsoever that anything is unusual about any of the funds that employ this kind of leveraged exposure.  And it was never brought up by Oppenheimer managers in any of their recent Morningstar analyst interviews.

*Id.*

Defendants "had unique information concerning the risks presented by highly-leveraged fixed income investments in vehicles such as AAA rated commercial mortgage-backed securities (CMBS), nonagency prime (jumbo) mortgages, AA and A rated financial-sector corporate bonds, and very short-maturity high-yield corporates. "  *Id.* ¶ 30.  Defendants "knew or should have known that these risky investments were inappropriate Trust investments given the stated

5

objectives of the Trust, and that its high risk investment strategies were likely to lead to catastrophic losses." *Id.* at 8-9, ¶ 30. "Despite the enormous losses incurred by account holders and the Trust due to [Defendants'] fixed income holdings, [Defendants] continued to recommend to the State that it retain those investments," resulting in additional losses to the Trust and Plan enrollees. *Id.* at 9, ¶ 31. "Following these massive losses by the Trust, the Plans were ranked as the worst performing 529 college savings plans in 2008 among all plans offered by any state in the United States." *Id.* ¶ 32.

In 2009, Plaintiffs sued Assignors for the losses suffered in their Plan accounts, on their own behalf and on behalf of a class of similarly situated account holders. *See* First Amended Class Action Complaint (Doc. 22-1) (hereinafter, "Class Action Complaint") filed in *Lu v. Education Trust Board*, Case No. D-0101-CV-2009-0205, First Judicial District Court, State of New Mexico (hereinafter referred to as the "Class Action Lawsuit"). The allegations of Plaintiffs' Class Action Complaint are incorporated by reference into the Amended Complaint filed in this proceeding. *See id.* at 4, ¶ 12.

In June 2010, while the Class Action Lawsuit was pending, Assignors entered into a partial settlement with Defendants. *See id.* at 5, ¶ 19. Pursuant to that settlement:

> Defendants paid Assignors $67,310,000 in exchange for a general release of claims, but Assignors did *not* release: "Any claims by or liability to the Board and its members, the State of New Mexico and their officer and employees for indemnification pursuant to Section 12.2 of the Services Agreement, for any and all losses suffered by any Affected Plan Participant in his account who does not execute a Release Letter Releasing the OppenheimerFunds Released Parties, whether such claims are asserted by arbitration, action filed in any State or federal court, or otherwise."

*Id.* (emphasis added).

"On October 7, 2013, the Assignors and Plaintiffs entered into a Stipulation of Settlement

pursuant to which they agreed to resolve the claims made against the Assignors in the [Class

Action Lawsuit] for consideration of a cash payment by Assignors to Plaintiffs in the amount of

$3,750,000, and the assignment of their indemnification rights against [Defendants]." *Id.* at 4,

¶ 14.

> Pursuant to the assignment of the Assignors' indemnification claims, Plaintiffs are
> entitled to pursue, for the benefit of the Lu Class, recovery for all Losses incurred
> or sustained by the Assignors, including but not limited to the cash payment made
> by the Assignors in settlement of the Class Action Lawsuit, attorneys' fees and
> costs incurred by the Assignors, and all damages suffered by the Assignors.

*Id.* at 5, ¶ 17.

Defendants had actual notice of this claim for Losses and had an opportunity to defend

and indemnify Assignors from the claim for Losses, but they chose to remain silent.  *Id.* ¶ 18.

"Defendants were specifically invited to participate in settlement negotiations between Plaintiffs

and Assignors, but again chose not to participate."  *Id.*  "Defendants were notified of Assignors'

election to compromise or settle Plaintiffs' claim against them for Losses, but Defendants failed

to take timely action to defend and contest the same.  *Id.*

### III. APPLICABLE LEGAL STANDARDS

#### A.     Motion to Dismiss

Defendants' Motion to Dismiss is brought pursuant to Federal Rule of Civil Procedure

12(b)(6).  Under Rule 12(b)(6), the Court "accept[s] all factual allegations in the complaint as

true and draw[s] all reasonable inferences in favor of the nonmoving party."  *Mink v. Knox*, 613

F.3d 995, 1000 (10th Cir. 2010).  To determine whether a motion to dismiss is properly granted,

the court "appl[ies] a plausibility standard to ascertain whether the complaint includes enough

facts that, if assumed to be true, state a claim to relief that is plausible on its face.  *Id.* (citing

*Ashcroft v. Iqbal*, 556 U.S. 662, __, 129 S. Ct. 1937, 1949 (2009) ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.")).

Federal Rule of Civil Procedure 8(a) "requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).   A "complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations" but "requires more than labels and conclusions." *Id*.  The standard does not require "heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face." *Id*. at 570.  To survive a motion to dismiss, a plaintiff need only "'nudge his claims across the line from conceivable to plausible.'" *Ridge at Red Hawk, L.L.C. v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007) (quoting *Twombly*, 550 U.S. at 570).

In ruling on a Rule 12(b)(6) motion, the court may consider only the complaint itself, and a few other limited categories of materials including exhibits attached to the complaint, documents that the complaint incorporates by reference, and materials of which the court may take judicial notice. *Berneike v. CitiMortgage, Inc.*, 708 F.3d 1141, 1146 (10th Cir. 2013).  The court is not required to consider extraneous material. *See, e.g.*, *Prager v. LaFaver*, 180 F.3d 1185, 1189 (10th Cir. 1999) (holding that it was not an abuse of discretion for a district court to decline to consider documents attached to a motion to dismiss that were both over-inclusive and under-inclusive).  And, to be considered by the court, the material submitted by a defendant on a motion to dismiss must be "indisputably authentic." *See id*. (citing cases).

A plaintiff is not required to anticipate a defendant's affirmative defenses, or to plead around them in the complaint. *Richards v. Mitcheff*, 696 F.3d 635, 637-38 (7th Cir. 2012). Dismissal is proper only where the facts establishing the affirmative defense are readily ascertainable from the complaint, and those facts conclusively demonstrate the defense. *Nisselson v. Lernout*, 469 F.3d 143, 150 (1st Cir. 2006).

> **B.      Governing Law**

Because the claims at issue here are based on New Mexico law, the Court's task is to interpret and apply the law of New Mexico as it believes the New Mexico Supreme Court would. *Coll v. First Am. Title Ins. Co*., 642 F.3d. 876, 886 (10th Cir. 2011).

> [T]he federal court's task is not to reach its own judgment regarding the substance of the common law, but simply to ascertain and apply the state law. The federal court must follow the most recent decisions of the state's highest court. Where no controlling state decision exists, the federal court must attempt to predict what the state's highest court would do. In doing so, it may seek guidance from decisions rendered by lower courts in the relevant state, appellate decisions in other states with similar legal principles, district court decisions interpreting the law of the state in question, and the general weight and trend of authority in the relevant area of law. Ultimately, however, the Court's task is to predict what the state supreme court would do.

*Wade v. Emcasco Ins. Co*., 483 F.3d 657, 665-66 (10th Cir. 2007) (internal quotations and citations omitted).

## IV. ARGUMENT

> **A.      The Amended Complaint Adequately Alleges that Defendants Are Liable for Indemnification Under the PMA.**

Defendants first argue that they are entitled to dismissal of the complaint on the basis that Plaintiffs have "failed to adequately allege any conduct by OFI that would trigger the indemnification provisions of the PMA." Motion to Dismiss at 9. This argument fails because

the Amended Complaint adequately alleges that Defendants are liable under the PMA to the Assignors, and therefore, to Plaintiffs as the Assignees.

As set forth above, in entering into the PMA, Defendants agreed to indemnify Assignors from losses suffered by the Assignors arising from breach of the PMA or other misconduct by OFI. *See* Amended Complaint at 3, ¶ 10; PMA, § 12.2.  In the Assignment, the Assignors explicitly recognized, acknowledged and stipulated that "Through the claims and demands made by Assignees in the [Class Action] Lawsuit, Assignors have suffered, incurred, sustained and become subject to Losses from and against which Oppenheimer agreed to indemnify Assignors as set forth in Sections 12.1 and 12.2 of the PMA."  Assignment (Exhibit A to Doc. 2-1), at 13, ¶ 4.  The Assignment, and this stipulation, are expressly incorporated by reference into the Amended Complaint.  Amended Complaint at 4-5, ¶ 16.

In addition, there are specific allegations set forth in the Amended Complaint that further demonstrate that Defendants' conduct breached the PMA and constitutes gross negligence, bad faith, willful misconduct and/or fraud.  These allegations are set forth in paragraphs 21 through 32 of the Amended Complaint and are largely quoted above.  As set forth in Plaintiffs' allegations, the accounts in issue suffered enormous losses in 2008 compared to their benchmarks.  *Id.* at 6, ¶ 23.  Those losses were not due to the performance of the market, but instead were directly caused by Oppenheimer's poor investment choices and improper use of leverage.  *See id.*  Defendants assumed management of one of the plans in 2008 and recommended reallocating the portfolios to its own products, including the Core Bond Fund.  *Id.* at 7, ¶ 25.  In making "massive purchases" of their own risky bond funds, and increasing leverage, Defendants took unnecessary risks.  *See id.* ¶ 26.  As a result of Defendants'

reallocations, by the middle of 2008, leverage had increased to more than 180%, which is "highly risky" contrary to the purpose of a fixed income holding. *See id.* Defendants continued to pursue this risky strategy "even after the stock market began crashing." *Id.* ¶ 27.

Defendants did not disclose the riskiness or high leverage in its fixed income funds. *See id.* at 8, ¶¶ 28-29. Defendants knew or should have known that their risky investments were inappropriate for the Trust and would to lead to catastrophic losses. *See id.* at 8, ¶ 30. In fact, account holders and the Trust incurred "enormous losses" due to Oppenheimer's investments. *See id.* at 9, ¶ 31. Nonetheless, "Oppenheimer continued to recommend to the State that it retain these investments." *See id.* The funds continued to lose value, until the plans were ranked as the worst performing savings plans in the country. *See id.* ¶¶ 31-32.

These allegations are sufficient to establish that Defendants breached their obligations under the PMA, and that Defendants' conduct constituted at the very least gross negligence, as well as bad faith, willful misconduct or fraud. Such conduct triggers the duty of indemnification, the right to which has been assigned to Plaintiffs. Under well-settled pleading standards, there is no obligation for Plaintiffs to provide more detail at this stage. These allegations are more than sufficient to "'nudge [the] claims across the line from conceivable to plausible.'" *Ridge at Red Hawk*, 493 F.3d at 1177 (quoting *Twombly*, 550 U.S. at 570). Accordingly, Defendants' motion to dismiss for failure to state a claim must be denied.

**B.    The Amended Complaint Adequately Alleges that the Assignors Suffered Losses as Defined by the PMA.**

Defendants argue that the Amended Complaint "fails to allege that the [Assignors] suffered any losses that can be laid at the feet of OFI." Motion to Dismiss at 11. According to Defendants, the Class Action Lawsuit between the Plaintiffs and the Assignors was solely about

losses caused by the Assignors, not by Defendants, and therefore there is no duty to indemnify. This is incorrect.

Plaintiffs entered into college savings agreements with the Assignors, not with Defendants.  *See* Class Action Complaint, at 5, ¶¶ 17-18.  Accordingly, Plaintiffs' cause of action for breach of contract as asserted in the Class Action Lawsuit was against the Assignors, not against the Defendants.  Plaintiffs' claims, however, explicitly recognized that the Defendants served as the Program Manager of the accounts.  *See* Class Action Complaint at 4, ¶ 13.  Further, the allegations made in the Class Action Lawsuit are replete with descriptions of *Defendants*' misconduct that caused the massive losses that Plaintiffs sought to recover.  *See, e.g.*, *id.* at 12 , ¶ 42 (alleging that the State's fixed income holdings imploded because of the advice of  the Program Manager, i.e., Oppenheimer); *id.* at 12-14, ¶¶ 43-48 (detailing risky and inappropriate investments made by Oppenheimer).

In defending against the Class Action Lawsuit, the Assignors consistently blamed Defendants for the losses that Plaintiffs sought to recover from Assignors, contending that those losses occurred "*as a result of Oppenheimer's breaches of its contract with the [Assignors], Oppenheimer's breaches of fiduciary duty and its gross negligence*."  *See* Joint Unopposed Motion for Final Approval of Class Action Settlement Agreement (Doc. 22-4), at 21 (emphasis added).  These are precisely the losses against which Defendants agreed to indemnify Assignors *See* PMA at 25, § 12.1 (defining "Losses" as "any and all losses, damages, costs, claims, liabilities, penalties, demands and expenses (including, without limitation, reasonable attorneys' fees and disbursements)"); § 12.2 ("OFI and OFDI will indemnify, defend and hold harmless [Assignors] from and against any and all Losses . . .  resulting from, arising out of or relating to a

breach of [the PMA] or constituting gross negligence, bad faith, willful misconduct or fraud" by Defendants ).  In assigning their claims for indemnification to Plaintiffs, the Assignors explicitly stipulated that they suffered Losses in the Class Action Lawsuit that were subject to indemnification by Oppenheimer.  *See* Assignment, Exhibit A to Doc. 2-1, ¶ 4.

In sum, the Amended Complaint adequately pleads that Assignors were exposed to liability and losses in the Class Action Lawsuit due to Defendants' breach of the PMA and its gross negligence and other misconduct, and that Assignors incurred substantial costs and losses as a consequence, including attorneys' fees and costs and the amount of the settlement payment. It is the very purpose of indemnification to shift these losses from the indemnitee to the indemnitor.  *See, e.g.*, *Budget Rent-A-Car Sys., Inc. v. Bridgestone, LLC*, 2009-NMCA-013, ¶ 145 N.M. 623, 203 P.3d 154 ("Traditional indemnification provides an indemnitee, who has been held liable for damages, the right to be made whole by a third party, such as the primary wrongdoer.").  Defendants' contention that the Amended Complaint should be dismissed because Assignors did not suffer losses triggering indemnification cannot be sustained.

**C.     There is No Basis for Dismissing the Amended Complaint on the Basis that the Claims Have Been Released.**

Defendants argue that the Amended Complaint "must also be dismissed because the Board has already released the claim that Plaintiffs are attempting to assert."  Motion to Dismiss at 13.  This affirmative defense, *see* Fed. R. Civ. P. 8(c)(1), cannot be established as a matter of law at the motion to dismiss stage as it is explicitly contradicted by the allegations of the Amended Complaint and is factually incorrect.

Plaintiffs are not obligated to plead around an anticipated affirmative defense.  *Richards*, 696 F.3d at 637-38.  Dismissal is proper only where the facts establishing the affirmative defense

are readily ascertainable from the complaint, and those facts conclusively demonstrate the defense. *Nisselson*, 469 F.3d at 150. That is not the case here. In the Amended Complaint, Plaintiffs allege that Assignors specifically did *not* release any claims for indemnification pursuant to Section 12.2 of the PMA for losses suffered "by any Affected Plan Participant in his account who does not execute a Release Letter Releasing the OppenheimerFunds Released Parties." Amended Complaint at 5, ¶ 19. Thus, taking the well-pleaded allegations of the Amended Complaint as true, the claims raised herein were expressly reserved and *not* released by the Assignors, except as to losses suffered by account holders who execute "a Release Letter Releasing the OppenheimerFunds Released parties." Who such persons might be, and what is meant by a "Release Letter Releasing the OppenheimerFunds Released Parties" raise questions of fact that cannot be determined on the basis of the pleadings and cannot be established as a matter of law at this stage.

Indeed, Plaintiffs' position is that this affirmative defense cannot be maintained at *any* stage of the proceedings because any releases that were signed by account holders are invalid, unenforceable and of no legal effect. Account holders did not need to sign these release to receive their share of the settlement, but some did anyway because of misleading notices that implied that the release were required. *See* Joint Unopposed Motion for Final Approval of Class Action Settlement Agreement (Doc. 22-4), at 23. In addition, many of the purported releases were executed in response to notices that incorrectly stated and inflated the settlement payments that would be received. *Id*. Defendants notified Oppenheimer that "By failing to properly calculate the pro-rata shares of Settlement Proceeds, providing flawed notices to Affected Plan Participants and obtaining releases based on the promise of incorrectly stated and inflated

settlement payments, OppenheimerFunds and Rust Consulting have committed numerous breaches of the Settlement Agreement, wrongfully induced Affected Plan Participants to execute releases, and exposed the Board and the Trust to substantial financial and reputational harm." *Id.* Accordingly, the signing of these purported releases by some percentage of account holders will not relieve Defendants of their duties of indemnification.

Defendants' contentions that Plaintiffs are "improperly" seeking to recover on behalf of the entire class that was certified in Class Action Lawsuit and that they are not entitled to recovery of attorneys' fees expended by Assignors in that case present additional disputed factual contentions that are not ripe for determination at this stage. Plaintiffs have adequately alleged their right to recover any and all "losses" suffered by the Assignors for which Defendants contractually agreed to provide indemnification. Plaintiffs have also adequately alleged (and Assignors have stipulated and agreed) that such losses include the Assignors' attorneys' fees and costs, the settlement payment, and other losses. *See* Amended Complaint ¶ 13, at 4; Assignment, Exhibit A to Doc. 2-1, ¶ 4. That is all that is necessary at this stage.

## D. There Is No Prohibition on the Assignment of the Indemnification Claims.

Defendants argue that the Amended Complaint should be dismissed because the PMA contains a "specific anti-assignment clause." Motion to dismiss at 14. Defendants' argument fails because the PMA only prohibits assignment of the PMA itself, not the indemnification claims asserted here.

Section 18.6 of the PMA, on which Defendants rely, provides in its entirety as follows:

Except as may occur in connection with a corporate reorganization, *this Agreement* shall not be assigned by any party, except with the written consent of the other parties, which consent may be refused for any reason in the sole discretion of such party; provided, however, that the Board shall not unreasonably withhold its consent in connection with

> an assignment by OFI or OFDI of its rights and obligations under this Agreement to an OFI Group Entity.

PMA at 42 (emphasis added).

As is clear from this language, this provision is explicitly limited to assignment of the PMA itself. New Mexico law follows the long-standing rule of common law that such anti-assignment provisions must be interpreted to prohibit only the delegation of the assignor's duties of performance. *See Paperchase P'ship v. Bruckner*, 1985-NMCA-003, ¶ 7, 102 N.M. 221, 693 P.2d 587 ("[A] provision prohibiting assignment of the contract bars only the delegation of duties.") (citing Restatement (Second) of Contracts § Section 322 (1970)). As a consequence, according to the Court of Appeals, "in most cases, if there is no delegation of duties, there is no violation of the prohibition on assignment." *Id.*

Here, Assignors did not assign or delegate any of their duties under the PMA, but only assigned specific rights to indemnification for the losses sustained by Assignors with respect to the claims made in the Class Action Lawsuit. The prohibition on assignment of the PMA itself is no bar to the assignment of these specific rights.

*Espinosa v. United of Omaha Life Insurance Co*., 2006-NMCA-075, 139 N.M. 691, 137 P.3d 631, relied on by Defendants, is inapposite. In that case, the annuity in question contained a notice stating that the annuity payments could not be assigned or used as collateral. *Id.* ¶ 2. Despite this clear and unambiguous prohibition, the payments were assigned to a third party. *Id.* ¶ 5. The New Mexico Court of Appeals noted that "anti-assignment clauses are generally disfavored," but found that the language of this particular anti-assignment clause indicated a clear intention to prohibit the assignment of the annuity payments. *Id.* ¶ 27. This reasoning is inapplicable to the anti-assignment clause in the PMA, which only prohibits assignment of the

16

agreement itself, without any language or circumstances indicating that specific rights arising under the agreement could not be assigned.  In such cases, the general rule as explicated by the New Mexico Court of Appeals in *Bruckner* applies.

For the same reasons, the case of *Ohio Environmental Development Limited Partnership v. Envirotest Systems Corp.*, 478 F. Supp. 2d 963 (N.D. Ohio 2007) also fails to support Defendants' argument.  In that case, the court affirmed the general rule that "'a contract term prohibiting assignment of "the contract" bars only the delegation to an assignee of the performance of a duty or condition.'"  *Id.* at 979 (quoting Restatement (Second) of Contracts § 322(1) (1981)).  The Court found, however, that an issue of fact existed as to the interpretation of the specific language in the anti-assignment clause at issue in the case, which "exceeds the traditional provision against assignment of 'the contract'" discussed in the authorities.  *Id*. at 981.  Again, that is not the case here, where the provision in Section 18.6 of the PMA prohibits assignment "of the Agreement."[1]

### E.     Defendants Cannot Establish the Defense of Failure to "Perfect" Indemnification Rights at this Stage of the Proceedings.

Defendants contend that the Amended Complaint should be dismissed because, according to Defendants, Assignors failed to "perfect" the indemnification rights that they assigned to Plaintiffs.  Motion to Dismiss at 15.  It is not clear what Defendants mean by the use of the term "perfect" in this context.  Typically, this term is applied to security liens and the procedures by which such liens are made effective.  *See, e.g*., NMSA 1978, § 48-2-2.1 (Procedure for perfecting certain mechanics' and materialmen's liens).  Defendants appear to be suggesting that

---

[1] Even if there was additional language creating ambiguity (which there is not), at best that would create an issue of fact as in *Envirotest*, 478 F. Supp. 2d at 980-81, and would still not provide grounds for dismissal.

similar requirements apply to indemnification rights and that the Court can rule as a matter of law, at the pleading stage, that Defendants prevail on this issue.  This argument fails for a number of reasons.

First, there is no statutory or common law requirement that contractual indemnification rights be "perfected" in order to be enforceable.  Instead, such indemnification rights arise under the agreed-upon terms of the contract.  In this case, the right of indemnification arises under Section 12.2 of the PMA.  As set forth in the Amended Complaint and discussed in detail above, Section 12.2 provides that Defendants agreed to "indemnify, defend and hold harmless" the Assignors from and against "Losses" as defined in the PMA, to the extent caused by Defendants. There is nothing in this provision that mandates any preconditions that must be met before such indemnification rights become enforceable.

The separate provision on which Defendants rely for their argument that Assignors failed to "perfect" these indemnification rights is found in Section 12.7.  That section, however, only states that "Any party (the 'Notifying Party') shall give to the other party (the "noticed party') written notice of the Notifying Party's knowledge of any Losses or Potential Losses against which any Noticed party has indemnified the Notifying Party under Sections 12.2 or 12.3 of this Agreement (the 'Indemnification Provisions')"  *See* PMA at 26, §12.7(a).  Nowhere is it stated that giving such notice is required to "perfect" the right of indemnification set forth in Section 12.2, or that failure to give such notice voids the right of indemnification.  Accordingly, there is no requirement for Plaintiffs to plead or prove that Assignors gave such notice in order to state a claim for indemnification.

Moreover, Section 12.7 specifically provides that "Failure to provide such notice shall not relieve any Noticed Party of any of its obligations, if any, under the Indemnification Provisions if such Noticed Party otherwise had actual knowledge of such Losses." *Id.* § 12.7(a). In the Amended Complaint, Plaintiffs allege that "Defendants had actual notice of this claim for Losses and had an opportunity to defend and indemnify Assignors from the claim for Losses, but they chose to remain silent." *See* Amended Complaint at 5, ¶ 18. These allegations are more than sufficient to rebut Defendants' contentions that notice was not given.[2]

Defendants also argue that Assignors never requested approval of the settlement, nor did they tender a request for a defense. Motion to Dismiss at 16-17. Again, these contentions are not appropriately resolved at the pleadings stage. Plaintiffs are under no obligation to anticipate these affirmative defenses, or to plead around them. These defenses raise numerous questions of fact, both as to the proper interpretation of the contract provisions on which Defendants rely, and as to what the parties did and did not do. For example, with respect to Defendants' contention that Assignors did not request approval of the settlement, the PMA provides that "No Indemnitee shall have the right to compromise or settle any matter relating to an asserted Loss without the

---

[2] Defendants rely on a letter from Defendants' counsel to the presiding judge in the state court case to support its claim that no notice was given. Motion to Dismiss at 16. Plaintiffs object to the Court's consideration of this letter, which contains facts that are subject to reasonable dispute and which constitutes inadmissible hearsay. *See* Fed. R. Evid. 201(b) (providing that courts can take judicial notice of a fact "that is not subject to reasonable dispute");*United States v. Burch*, 169 F.3d 666, 672 (10th Cir.1999) (court would not take judicial notice of facts from hearsay affidavit); *S.E.C. v. Goldstone*, 952 F. Supp. 2d 1060, 1192-93 (D.N.M. 2013) (court may take judicial notice of the contents of documents, but not of the truth of the contents). Plaintiffs also object to the reference in Defendants' Motion to Dismiss to a letter of October 2, 2013 from OFI to the Board. Motion to Dismiss at 16. This letter is outside the record and is not subject to judicial notice, and therefore should not be considered by the Court in ruling on Defendants' motion. *See Berneike*, 708 F.3d at 1146 (court's consideration of letter not incorporated into or referenced in complaint).

written consent of the Indemnitor, *except that any Indemnitee shall have the right to compromise or settle any Loss asserted against it if it has given written notice to the Indemnitor of the election to exercise such right and the Indemnitor has failed to take timely action to defend and contest the same*." PMA at 27, § 12.7(d) (emphasis added). The Amended Complaint alleges that this is exactly what happened here: "Defendants were notified of Assignors' election to compromise or settle Plaintiffs' claim against them for Losses, but Defendants failed to take timely action to defend and contest the same." *See* Amended Complaint at 5, ¶ 18. Defendants concede this point in their motion. *See* Motion to Dismiss at 16 ("The Board … 'informed' OFI of the settlement.") Defendants add that they did not "approve" of the settlement and wrote a letter disclaiming any indemnification obligations, *see id.*, but that is hardly sufficient to establish as a matter of law that they took "timely action to defend and contest" the settlement as would be required under Section 12.7(d) of the PMA. Moreover, Defendants' argument that the assignment is invalid because OFI did not approve the settlement is specious. If validity depended on Defendants' consent, then Defendants would effectively have had complete power to prevent Assignors from settling the claims made against them, an unreasonable construction of the PMA.

Similarly, with respect to Defendants' contention that Assignors never "tendered" a request for defense, there are factual questions as to the existence of any such obligation, as well as to what the parties did or did not do. The PMA provides that the indemnitor is required to defend, at its own expense, the other party. *See* PMA at 26, § 12.7(b). There is no provision requiring a party to "tender a request" for such defense. Moreover, as the Amended Complaint alleges, Defendants had actual notice of this claim for Losses and had an opportunity to defend

Assignors from the claim for Losses, but they chose to remain silent. *See* Amended Complaint at 5, ¶ 18.  The PMA provides that a party has a right to counsel of its own choosing where the indemnitor fails to defend or when there is a conflict of interest between the indemnitor and the indemnitee, which is clearly the case here.  *See* PMA at 27, § 12.7(d).

> **F.      This Is Not a Class Action and Plaintiffs Have Standing to Bring These Claims on Behalf of the Beneficiaries of the Assignment.**

Defendants' final argument is that the Amended Complaint should be dismissed because "[t]hese five Plaintiffs cannot, as a matter of law, bring a direct action in their own name seeking relief on behalf of an absent class without seeking to certify that class."  Motion to Dismiss at 17.  As Defendants acknowledge, however, Plaintiffs are not bringing this action as a class action. *Id.* at 4; Amended Complaint at 2, ¶ 7.  Instead, this is a direct action based on the assignment of the Assignors' claims to the five named Plaintiffs.  *Id.* at 4; Amended Complaint at 2, ¶ 7. Plaintiffs do not seek to certify a class, nor is it necessary or appropriate to certify a class. Accordingly, the provisions of Federal Rule of Civil Procedure 23 are inapplicable.

The claims made herein arise from the Assignment.  The Assignment provides:

> For good and valuable consideration received, Assignors hereby transfer, assign and set over *to Assignees* all indemnification rights that any Assignor possesses against OFI, OFIPI and/or OFDI with respect to any and all Losses as defined in paragraph 4 of this Assignment and existing as of October 7, 2013, including but not limited to rights of indemnification arising under Section 12.1 and 12.2 of the PMA and Section V of the June 16, 2010 Settlement Agreement.

Assignment, Exhibit A to Doc. 2-1, ¶ 7 at 2-3 (emphasis added).  The "Assignees" are the same five Plaintiffs bringing the claims set forth in the Amended Complaint.  *Compare* Exhibit A to Doc. 2-1, at 1, *with* Amended Complaint at 1.  Thus, the claims asserted in the Amended Complaint are held exclusively by the five individuals, and only they can bring those claims.

As set forth in the Amended Complaint, "Plaintiffs hold the assigned claims on behalf of themselves and a class certified in New Mexico State Court (the "Lu Class")." *See* Amended Complaint at 2, ¶ 7.  They hold these claims, and assert them here, "for the benefit of the Class." Assignment, Exhibit A to Doc. 2-1, at 1.  Federal Rule of Civil Procedure 17(a)(1)(F) provides that "a party with whom or in whose name a contract has been made for another's benefit" may bring suit in his or her own name "without joining the person for whose benefit the action is brought."  This is the procedure that Plaintiffs are following here.

There is no "absent class" here, as Defendants assert.  The reference to the "Class" in the Assignment is a short-hand method of identifying the beneficiaries of the Assignment.  The Plaintiffs are not acting as "representatives" of a class within the meaning of Rule 23(a), but are instead acting as assignees on behalf of the beneficiaries of the assignment.  The beneficiaries have no independent right to pursue any such claims.  Hence, the procedures of Rule 23, which are designed to protect the interests of both class members and defendants where a representative party is acting on behalf of absent parties who possess independent claims, are inapplicable.

For these reasons, this case is unlike the case of *Zimmerman v. Epstein Becker & Green, P.C.*, 657 F.3d 80 (1st Cir. 2011), on which Defendants rely.  In that case, the Plaintiffs obtained a judgment on behalf of a certified class in one case, found that the judgment was uncollectable against the defendants in that case, and then filed new actions against new defendants.  The new actions were brought by Plaintiffs as "Class Representatives" and "were styled as class actions." *Id*. at 82.  However, even though the Plaintiffs "were seeking 'class based-relief' . . . [they] declined to seek certification of the class as required by Rule 23."  *Id*.  Under such circumstances, the First Circuit Court of Appeals held that the Plaintiffs "could not proceed

without following Rule 23." *Id*. at 85.  Here, on the other hand, the Plaintiffs are not bringing

these claims as class representatives, the action is not styled as a class action, and the Plaintiffs

are not seeking class-based relief.

On the contrary, the indemnification claims made herein originally belonged to the

Assignors, not the account holders, and Plaintiffs are standing in the shoes of the Assignors, not

the account holders, in asserting these claims.  The account holders are only contractual

beneficiaries of any recovery obtained by the Plaintiffs, and have no independent standing to

bring these claims as individuals.   In its order granting the motion to dismiss, the district court in

*Zimmerman* was concerned that the "plaintiff  class members, as well as Defendants, face

possible prejudice, since they have no opportunity to opt out of a class remedy if they prefer to

pursue their own independent claims."  *Zimmerman v. Epstein Becker & Green, P.C.*, No. 09-cv-

30194-MAP, 2010 WL 2724001 at *4 (D. Mass. 2010).  No such concerns are present here,

since there are no independent claims that could be pursued.  The reasoning of *Zimmerman* does

not apply.

In sum, this is a direct action, not a class action.  The claims raised herein originally

belonged to the Assignors, Plaintiffs are the assignees of the claims raised herein, and only the

Plaintiffs have standing to bring these claims.  There is no class to be certified.  Defendants'

motion to dismiss on the basis that Plaintiffs must plead compliance with Rule 23 must be

denied.

## V.  LEAVE TO AMEND

The Amended Complaint was filed in New Mexico state court, and removed by

Defendants.  Plaintiffs prepared their pleading in conformance with the New Mexico Rules of

Civil Procedure, setting forth a plain statement of the factual allegations sufficient to demonstrate an entitlement to relief.  The courts of the state of New Mexico do not follow *Iqbal*.  *See, e.g.*, *Madrid v. Village of Chama*, 2012-NMCA-071, ¶¶ 16-17, 283 P.3d 871 (declining to construe New Mexico Rule of Civil Procedure 1-012(B)(6) in accordance with *Iqbal* or the federal standard for a motion to dismiss).  As set forth above, Plaintiffs believe they have amply demonstrated that they have fully and adequately pleaded the necessary allegations required to bring the claims raised herein as assignees of these claims for indemnification even under the federal standard set forth in *Iqbal* and other cases.  If the Court finds, however, that there are any deficiencies that would justify granting Defendants' Motion to Dismiss under the federal standard, Plaintiffs should be permitted leave to file an amended pleading setting forth additional allegations.  *See* Fed. R. Civ. P. 15(a)(2) ("[A] party may amend its pleading only with the opposing party's written consent or the court's leave.  The court should freely give leave when justice so requires.").

## VI. CONCLUSION

For all the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendants' Motion to Dismiss and that it enter such other and further relief as it deems just and proper.  In the event that the Court grants the Motion to Dismiss in part or in whole, then Plaintiffs respectfully request leave to file an amended pleading and/or leave to file a motion pursuant to Rule 15(a)(2).

Respectfully submitted,

ROTHSTEIN, DONATELLI, HUGHES,
DAHLSTROM, SCHOENBURG & BIENVENU, LLP

*/s/ John C. Bienvenu*
John C. Bienvenu
Kristina Martinez
P.O. Box 8180
1215 Paseo de Peralta
Santa Fe, New Mexico 87504-8180
(505) 988-8004

KELLER ROHRBACK L.L.P.
Lynn Lincoln Sarko
T. David Copley
Amy Williams-Derry
Benjamin Gould
1201 Third Avenue, Suite 3200
Seattle, WA 98101
(206) 623-1900

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I certify that on September 12, 2014, I filed the foregoing electronically through the

CM/ECF system, which caused the following parties or counsel to be served by electronic

means, as more fully reflected on the Notice of Electronic Filing:

Joshua D.N. Hess     joshua.hess@dechert.com

Kevin D Pierce     kdp@modrall.com, kathryn.vangaasbeek@dechert.com,
kiml@modrall.com

Mark P DiPerna     mark.diperna@dechert.com

Paul M. Fish     pfish@modrall.com, michelle@modrall.com

*/s/ John C. Bienvenu*_____
John C. Bienvenu
